IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 21, 2026

**STATE OF TENNESSEE v. MARIO REED**

**Appeal from the Circuit Court for Montgomery County**
**No. CC-18-CR-1469       William R. Goodman, III, Judge**
_____

**No. M2025-00099-CCA-R3-CD**
_____

The Defendant, Mario Reed, was convicted in the Montgomery County Circuit Court of evading arrest involving risk of death or injury, a Class D felony; attempted tampering with evidence, a Class D felony; and reckless endangerment committed with a deadly weapon, a Class E felony. After a sentencing hearing, the trial court merged the reckless endangerment conviction into the evading arrest conviction and sentenced the Defendant as a Range II, multiple offender to concurrent seven-year sentences for evading arrest and attempted tampering with evidence. On appeal, the Defendant contends that (1) the trial court erred by refusing to dismiss the indictment due to a violation of Article IV of the Interstate Compact on Detainers ("ICD"),[1] (2) the evidence is insufficient to support his conviction of attempted tampering with evidence and the jury rendered an inconsistent verdict for that offense, and (3) his seven-year sentence for evading arrest is excessive. Based upon our review, we affirm the judgments of the trial court. However, we remand the case to the trial court for sentencing on the reckless endangerment conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed,**
**Case Remanded**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and STEVEN W. SWORD, JJ., joined.

John D. Parker (on appeal and at trial), and Chase T. Smith, Edward Earl DeWerff, Travis N. Meeks, and Christopher Clark (pre-trial), Clarksville, Tennessee for the appellant, Mario Reed.

Jonathan Skrmetti, Attorney General and Reporter; Lacy E. Wilber, Senior Assistant Attorney General; Robert J. Nash, District Attorney General; and Chris W. Dotson, Dillon

---

[1] Although the parties refer to the Interstate Agreement on Detainers or "IAD" in their briefs, the Interstate Compact on Detainers or "ICD" has been adopted in Tennessee. The IAD is the federal and almost-identical counterpart to the ICD. We will refer to the Tennessee adopted "ICD" in this opinion.

Ezekiel Barker, and Crystal Morgan, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

In 2018, the Montgomery County Grand Jury returned a fifteen-count indictment against the Defendant. In twelve counts, the grand jury charged the Defendant and Andria Michelle Dunn jointly with the following offenses: count one, possessing three hundred grams or more of methamphetamine with intent to manufacture, sell, or deliver; count two, possessing three hundred grams or more of cocaine with intent to manufacture, sell, or deliver; count three, possessing oxycodone with intent to manufacture, sell, or deliver; count four, simple possession of marijuana; count five, possessing a handgun with intent to go armed during the commission of or attempt to commit the dangerous felony alleged in count one; count seven, possessing a handgun with intent to go armed during the commission of or attempt to commit the dangerous felony alleged in count two; count nine, evading arrest with a motor vehicle that created a risk of death or injury to innocent bystanders; count ten, tampering with evidence; count eleven, reckless endangerment with a deadly weapon, i.e., a motor vehicle; count twelve, possessing drug paraphernalia; count fourteen, contributing to the dependency or neglect of a child; and count fifteen, misdemeanor theft of a handgun. In the remaining three counts, the grand jury charged the Defendant alone as follows: count six, possessing a handgun with intent to go armed during the commission of or attempt to commit the dangerous felony alleged in count one and the Defendant had prior felony convictions; count eight, possessing a handgun with intent to go armed during the commission of or attempt to commit the dangerous felony alleged in count two and the Defendant had prior felony convictions; and count thirteen, following too closely.

The Defendant was tried separately from his codefendant in July 2024. Prior to jury selection, the State announced that it would not proceed on counts three, four, five, seven, thirteen, fourteen, and fifteen. Therefore, the Defendant proceeded to trial in counts one and two for possessing methamphetamine and cocaine; counts three and four for possessing a firearm; and counts nine through twelve for evading arrest, tampering with evidence, reckless endangerment, and possessing drug paraphernalia.

At trial, K-9 Officer Dale Becraft with the Montgomery County Sheriff's Office ("MCSO") testified that on the night of July 2, 2017, he was on patrol in the area of Highway 48 and Salem Road. About midnight, he saw a woman walking on Salem Road, which he thought was "unusual." Officer Becraft stopped to check on the woman and ask if she was okay. The woman said she was "fine" and was "going to meet someone on

Highway 48." Officer Becraft left the woman but pulled into a Food Lion parking lot. He saw her "come over the hill from Salem Road, to Highway 48." He also saw a maroon Nissan Maxima at the intersection. Although the traffic light was green, the Maxima was stopped. Officer Becraft "pulled out to take a closer look" and saw the Maxima travel through the intersection. The Maxima accelerated and pulled up close behind a car that was traveling in front of it. Officer Becraft noticed that the Maxima had dark-tinted windows, so he decided to conduct a traffic stop.

Officer Becraft testified that he initiated the stop at an Exxon on Highway 48 and that the Maxima turned into the parking lot. Officer Becraft approached the driver, who was the Defendant, and the Defendant rolled down his window. Andria Dunn was sitting in the front passenger seat. Officer Becraft obtained their driver's licenses and the vehicle's registration. He noticed that the Defendant's "voice was a little trembly" and that the Defendant's hand was "shaky" when the Defendant handed over the Defendant's license. Officer Becraft returned to his patrol car and "ran" the licenses; neither of the vehicle's occupants had outstanding warrants. Officer Becraft returned to the Maxima, asked the Defendant to exit the car, and asked for consent to search the vehicle. The Defendant said he did not have anything in the car, which Officer Becraft took as a denial of consent. Officer Becraft saw bulges in the Defendant's pockets, so he conducted a pat-down for weapons. The bulges turned out to be wads of cash in different denominations, which Officer Becraft knew to be an indication of drug dealing.

Officer Becraft testified that he wanted his drug dog to sniff the exterior of the Maxima, so he returned to his patrol car and called for backup. He did not want to delay the traffic stop for the dog sniff, so he planned to have the backup officer hand the citation to the Defendant while the dog conducted the exterior sniff. However, when the Defendant saw the backup officer arrive, the Defendant jumped into the Maxima and drove away.

Officer Becraft testified that he activated his lights and siren and began pursuing the Defendant. The Defendant turned right onto Highway 12, and Officer Becraft chased him for two to three miles. However, when Officer Becraft announced over his police radio that their speeds were over one hundred miles per hour, Officer Becraft's supervisor had him end the pursuit for public safety. Other officers later stopped the Defendant on Highway 12. Officer Becraft went to the scene of the stop and was told to go to the Excel Market on Highway 12. When he arrived, he found a Ziploc bag containing white powder and two black bags in the grass, near the highway. Dew was on the grass but was not on the bags, so Officer Becraft thought the bags had been in the grass for a brief period of time. Inside the black bags, he found methamphetamine, powder cocaine, and crack cocaine; sets of digital scales with drug residue on them; pill bottles; latex gloves; and a black semiautomatic handgun. The gun's magazine was loaded, and one round was in the chamber of the gun.

- 3 -

Officer Becraft testified that some of the drugs in the black bags were packaged in small baggies, which he knew from his experience as a law enforcement officer was a convenient way for drug dealers to transport and sell narcotics. Police officers found the Defendant's wallet in the center console of the Maxima, and the wallet contained a large amount of cash in different denominations. Officers also found latex gloves in the center console, and the gloves were the same type found on the side of Highway 12. The State played a video of Officer Becraft's traffic stop and pursuit of the Defendant for the jury.

On cross-examination, Officer Becraft acknowledged that the Defendant gave a turn signal before pulling into the Exxon parking lot and that the Defendant produced a valid driver's license, registration, and insurance. Officer Becraft never checked the window tint on the Maxima, which was one of the reasons he stopped the Defendant. Officer Becraft acknowledged that it was not unusual for a person to act nervous during a traffic stop, that the Defendant claimed he was nervous because "black males have been shot by police," and that the Defendant had the right to refuse a request to search the car. Officer Becraft told the Defendant that he was going to return to his patrol car and write a warning citation for following too closely. Instead, he returned to his patrol car and called for backup because he wanted to use his drug dog to sniff around the car. When the Defendant fled, Officer Becraft still possessed the Defendant's driver's license, so he knew the Defendant's name and address. Officer Becraft said that he did not know what happened to the Defendant's money, which the Defendant claimed he won playing poker, but that the money may have been awarded to the MCSO's "drug fund."

Officer Becraft testified that Ms. Dunn's child was sleeping in a car seat in the backseat of the Maxima during the pursuit. After officers stopped the Defendant, Ms. Dunn told them that the Defendant threw a bag out of the car. Officer Becraft spoke with Ms. Dunn and told her that she was facing very serious charges, including child endangerment. Officer Becraft's video camera did not capture the Defendant throwing anything out of the Maxima, and Officer Becraft said he could not prove the Defendant did so. He said he charged the Defendant and Ms. Dunn with the same crimes because they both had access to the drugs and the firearm. A backpack belonging to Ms. Dunn's child was later found at the Department of Children's Services. The backpack contained drug paraphernalia: multiple baggies, a cut straw, and a knife. Officer Becraft said he did not recall the gun's belonging to someone named "Jordan Dunn." At that point, defense counsel showed him the indictment, and Officer Becraft acknowledged that count fifteen alleged the gun was stolen from Jordan Dunn, which was the same last name as the codefendant, Andria Dunn.

Andria Dunn testified that she had an "[o]n-and-off" addiction to drugs but that she completed drug rehabilitation in February 2023. She acknowledged that she had remained sober since receiving treatment but then said that she had experienced "relapses." She said she was testifying sober.

- 4 -

Ms. Dunn testified that in July 2017, she was using pills. Her then-husband also was a drug addict and was abusive, and she knew the Defendant through her husband. Ms. Dunn said that on July 3, she was "trying to get clean." However, she was "going through withdrawals," so she contacted the Defendant to ask if he had any opiates to help her with her withdrawal symptoms. The Defendant agreed to pick her up and drive her to a motel room he had rented. The Defendant told Ms. Dunn that he was not going to stay at the motel because he was going to drive to Hopkinsville for a poker game. The Defendant picked up Ms. Dunn at her home on River Road about midnight. Ms. Dunn did not think he had any drugs in his possession, so she did not ask him for drugs. She took her daughter, who was almost two years old, with her and put her daughter into the Defendant's daughter's car seat, which was in the backseat of the Maxima. Ms. Dunn was sitting in the front passenger seat.

Ms. Dunn testified that the Defendant stopped at a red traffic light near a Food Lion. When the light turned green, Ms. Dunn noticed that a police car was following them. She said that the officer "blue lighted" the Defendant and that the Defendant pulled into a gas station. Ms. Dunn and the Defendant gave their identifications to the officer, and the officer asked the Defendant some questions, including whether the baby in the backseat belonged to the Defendant and Ms. Dunn. The Defendant told the officer that the baby was Ms. Dunn's baby. Ms. Dunn said that the officer then "pulled" the Defendant out of the car and asked to search the vehicle.

Ms. Dunn testified that at some point, the Defendant "jumped into the car" and "took off." Ms. Dunn stated that she asked the Defendant what was going on and that he said "something about K-9 pulling up." The Defendant did not know the area, so Ms. Dunn began directing him. She said, "The only thing running through my head was to get my daughter to safety and that was to my dad's house." The Defendant turned onto Highway 12. When they were near the Excel Market, Ms. Dunn turned completely around in her seat to check on her daughter, who was asleep. While Ms. Dunn was on her knees and was facing her daughter, the Defendant told her not to move and rolled down the passenger window. Ms. Dunn said that she heard the wind blowing and that the Defendant rolled up the window "when he got done." Ms. Dunn turned around and sat back down. She said that she did not see the Defendant throw anything out of the car but that the Defendant later "said something about going back and getting what he threw out." The Defendant returned to the area of the Excel Market, but a police officer "blue lighted" him. The Defendant pulled over, and police officers removed him and Ms. Dunn from the car at gunpoint. Ms. Dunn told the officers about the Defendant's rolling down the window near the Excel Market.

Ms. Dunn testified that the Department of Children's Services ("DCS") took custody of her daughter that night. She acknowledged that charges related and unrelated

to this case were pending against her. She said that she was telling the truth and that no one had promised her anything in exchange for her testimony.

On cross-examination, Ms. Dunn testified that her daughter's diaper bag, which was a Dora the Explorer backpack, accompanied her daughter to DCS and that law enforcement searched the backpack. She said she did not remember if drug paraphernalia, including a cut straw, was in the backpack. She denied knowing that DCS probably would take custody of her daughter and denied telling the police that she saw the Defendant throw a backpack out of the window. Ms. Dunn acknowledged that in November 2021, she was in a vehicle in which the police found a felony amount of methamphetamine. The police also found a small amount of fentanyl and a cut straw on her person. She denied blaming her codefendants in that case. Ms. Dunn acknowledged that despite completing rehabilitation in January 2023, the police found methamphetamine in her car in December 2023, which resulted in her being charged with simple possession. She said that she did not possess the methamphetamine, explaining that she shared her car with her roommate. She then acknowledged that her roommate was her boyfriend, who had outstanding warrants and pending drug charges. She acknowledged that she was testifying against the Defendant because she wanted "to get a better deal" in her case.

John Scott, Jr., a special agent forensic scientist with the Tennessee Bureau of Investigation ("TBI") Crime Laboratory and an expert in forensic chemistry, testified that he analyzed drug evidence collected by Officer Becraft. Agent Scott first tested a bag that contained a crystalline substance. The bag weighed 401.53 grams, and the substance was methamphetamine. Because three hundred grams of methamphetamine triggered the greatest penalty for methamphetamine possession in Tennessee, he did not test additional bags containing a similar substance. Next, he tested bags containing white powder. The powder weighed 352.24 grams and was cocaine. Because three hundred grams of cocaine triggered the greatest penalty for cocaine possession in Tennessee, he did not test additional bags of white powder. Finally, he tested a rock-like substance. The substance weighed 72.8 grams and was crack cocaine.

Kathi Gibson, a special agent forensic scientist with the TBI Crime Laboratory and an expert in latent print examination, testified that she examined the pistol, digital scales, and plastic bags for fingerprints. She did not find any fingerprints of value on the gun, gun magazine, or plastic bags. She found one fingerprint of value on a set of digital scales, but the fingerprint did not match the Defendant. She said that not finding the Defendant's fingerprints on the items did not mean he did not touch the items. Agent Gibson did not compare Ms. Dunn's fingerprints to the fingerprint found on the set of digital scales.

Ladd Kuykendall, a special agent forensic scientist with the TBI Crime Laboratory and an expert in firearms and tool mark identification, testified that he examined and test-

fired the nine-millimeter pistol. The gun was in normal operating condition with the safety features functioning.

At the conclusion of Agent Kuykendall's testimony, the State rested its case. The Defendant did not present any proof, and the jury found him not guilty of count one, possessing three hundred grams or more of methamphetamine with intent to manufacture, sell, or deliver; not guilty of count two, possessing three hundred grams or more of cocaine with intent to manufacture, sell, or deliver; not guilty of count three, possessing a handgun with intent to go armed during the commission of or attempt to commit the dangerous felony alleged in count one; and not guilty of count four, possessing a handgun with intent to go armed during the commission of or attempt to commit the dangerous felony alleged in count two. The jury found him guilty as charged in count nine of evading arrest with a motor vehicle that created a risk of death or injury to innocent bystanders; guilty in count ten of attempted tampering with evidence as a lesser-included offense of tampering with evidence; and guilty as charged in count eleven of reckless endangerment with a deadly weapon, i.e., a motor vehicle.

## ANALYSIS

### I. Interstate Compact on Detainers

The Defendant claims that the trial court erred by refusing to dismiss the indictment based on a violation of Article IV of the ICD. The State argues that the trial court did not err because the trial court correctly found that the Defendant consented to a continuance of his trial. We agree and conclude that the trial court did not abuse its discretion by denying the motion to dismiss the indictment.

The State indicted the Defendant in 2018, and he retained Chase Smith to represent him. Mr. Smith filed a motion to suppress evidence based on an unlawful traffic stop, which the trial court denied on July 22, 2019. Shortly thereafter, Mr. Smith withdrew from the Defendant's case. On August 29, 2019, the trial court appointed Travis Meeks to represent the Defendant. The Defendant's trial had been set for July 21, 2020, but Mr. Meeks requested a continuance in June 2020 because he had been unable to meet with the Defendant due to the Covid-19 pandemic. The trial was reset for November 17, 2020, but Mr. Meeks requested a second continuance. At some point, the Defendant, who had been on bond in this case, ended up in confinement in Kentucky but was returned to Tennessee pursuant to a detainer. The record does not show the date the Defendant was returned to Tennessee, but the technical record indicates that he was in the Montgomery County Jail pursuant to the detainer in February 2023. Meanwhile, Mr. Meeks withdrew from the Defendant's case. From January 6 to March 24, 2023, the trial court appointed a series of

attorneys, including Mr. Smith again, to represent the Defendant. The last of the attorneys, Chris Clark, filed a motion to continue the trial.

The trial court held a hearing on the motion on April 6, 2023. At the outset of the hearing, the trial court stated that the Defendant "is here under the Interstate Compact on Detainers" and that his trial date was set for April 17, 2023. Mr. Clark advised the trial court that he recently had been appointed to the Defendant's case and that he filed the motion to continue "based on good cause" because he was going to be working in another county on the scheduled trial date and because he needed time to prepare for trial. The following colloquy then occurred:

> THE COURT: My review of the record indicates that [the Defendant] is here under Article 4 of the Compact, which is [why] the State brought him here. Which, ordinarily, would require a trial within 120 days.
>
> However, under 40-31-101, Article 4 of Subsection (c), it says, "For good cause shown in open court with the Defendant and/or Defendant's counsel present, the Court may grant [a] necessary and reasonable continuance[]."
>
> For purposes of the record, Mr. Clark, does [the Defendant] consent to the continuance?
>
> MR. CLARK: He did not object to me, Your Honor, that -- that -- to continue it. He understands that --
>
> THE COURT: All right.
>
> MR. CLARK: -- counsel needs time to prepare.
>
> THE COURT: The Court finds that there is good cause to continue this matter.
>
> MR. CLARK: I'm sorry, Your Honor?
>
> THE COURT: I said, "The Court does find that there's good cause to continue this matter."
>
> [THE STATE]: For the record, does the Court find that the Defendant does not object to the continuance?

- 8 -

THE COURT: Mr. Reed, Mr. Clark here has asked to continue this case to properly prepare this case for trial. Are you agreeing to the continuance?

[THE DEFENDANT]: How long is the continuance for?

THE COURT: Well, we're going to set a trial date. But my recollection is, is that Mr. Chase Smith was originally retained to represent you. He withdrew.

Mr. Travis Meeks was appointed to represent you. Then you were brought back here. Mr. Meeks asked to be relieved as counsel.

Mr. Chase Smith was appointed to represent you. And you requested that he no longer represent you.

We appointed Mr. Howard to represent you.

[THE DEFENDANT]: I -- I had paid Chase Smith.

THE COURT: Okay.

[THE DEFENDANT]: And so we had a conflict, so that's why I said that.

THE COURT: Well, I'm putting on the record that Mr. Clark was recently appointed due to several other attorneys for one reason or another having to be allowed to be -- to withdraw.

So to answer your question, the matter can be set -- Mr. Clark, I know you have a scheduling conflict. Are you prepared? Do you have all the discovery?

MR. CLARK: I do have the discovery, Your Honor[.]

. . . .

I have reviewed the discovery. If -- if -- if he absolutely insists on trying a case, I've tried them on less notice than that. But haste does make waste.

- 9 -

And so I would caution [the Defendant] about it.

. . . .

[THE STATE]: The State can be ready, Judge.

MR. CLARK: We can be ready, Judge.

THE COURT: All right. It will be set for May 15th, which puts the trial conference April 27th.

The Defendant did not go to trial with Mr. Clark as counsel as scheduled on May 15, 2023. On June 8, 2023, the trial court appointed Greg Smith to replace Mr. Clark. On July 28, 2023, the trial court appointed John Parker to replace Mr. Smith. Mr. Parker filed a motion to dismiss the indictment based on a violation of Article IV of the ICD. In April 2024, the Defendant finally went to trial with Mr. Parker as defense counsel.

On the first day of trial, prior to jury selection, the trial court addressed the Defendant's motion to dismiss the indictment. Mr. Parker argued that because the trial court set the Defendant's trial for May 15, 2023, which was more than one hundred twenty days after the Defendant's arrival in Tennessee on the ICD, the State violated Article IV of the ICD. Mr. Parker acknowledged that the trial court set the May 15, 2023 trial date because previous defense counsel, Mr. Smith, requested a continuance. However, Mr. Parker argued that the Defendant did not consent to the continuance when the trial court specifically asked him about consent; the trial court granted the continuance for the benefit of Mr. Smith, not the Defendant; and Mr. Smith said he could try the case on the scheduled trial date if the Defendant insisted on that date. The State responded that the trial court granted the continuance "for good cause shown" because Mr. Clark had been appointed to the Defendant's case recently and needed time to prepare for trial. The State also argued that the Defendant waived the alleged ICD violation because he failed to object to the continuance. The trial court found that the Defendant never expressed an objection to the continuance, that Mr. Clark made a "reasonable request" for additional time to prepare for trial, and that good cause was shown for the continuance. Accordingly, the trial court denied the motion to dismiss the indictment.

The compact on detainers provides cooperative procedures for the exchange of prisoners between states for trial and is codified at Tennessee Code Annotated sections 40-31-101 to -108. Article IV provides, "The appropriate officer of the jurisdiction in which an untried indictment, information or complaint is pending shall be entitled to have a prisoner against whom the appropriate officer has lodged a detainer and who is serving a term of imprisonment in any party state made available" for trial. Tenn. Code Ann. § 40-

- 10 -

31-101, Art. IV(a). A trial that proceeds in Tennessee under Article IV shall begin within one hundred twenty days of the defendant's arrival in the state. *Id.* at Art. IV(c). However, "for good cause shown in open court, the prisoner or the prisoner's counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance." *Id.* Failure to comply with the time limit does not require dismissal of the indictment if the continuance beyond the time limit "is necessary or reasonable." *State v. Garmon*, 972 S.W.2d 706, 710 (1998). "The Provisions of the [ICD] are to be construed liberally in favor of the prisoners it was intended to benefit." *Id.* (citing *State v. Gipson*, 670 670 S.W.2d 637, 639 (Tenn. Crim. App. 1984)). We review a trial court's denial of a motion to dismiss the indictment based on a violation of the ICD for an abuse of discretion. *State v. Green*, 680 S.W.2d 474, 475 (Tenn. Crim. App. 1984), *overruled on other grounds by State v. Moore*, 774 S.W.2d 590, 594-95(Tenn. 1989).

Initially, the State claims that the Defendant has waived this issue because the detainer is not in the appellate record. We agree with the State. The record does not reflect when the detainer was placed on the Defendant, and the Defendant has not cited anything in the record to show when he was returned to Tennessee pursuant to the detainer.[2] Accordingly, the record does not show when the one-hundred-twenty-day time limit began to run. The State also notes that the Defendant's motion to dismiss, based on a violation of Article IV of the ICD, is not in the appellate record. "It is the duty of the appellant to prepare a record which conveys a fair, accurate, and complete account of what trans[pired] in the trial court with respect to the issues which form the basis of the appeal." Tenn. R. App. P. 24(b); *State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991) (citing *State v. Miller*, 737 S.W.2d 556, 558 (Tenn. Crim. App. 1987)). Therefore, the issue is waived.

## II. Sufficiency/Inconsistent Verdicts

Next, the Defendant claims that the evidence is insufficient to support his conviction of attempted tampering with evidence because the only proof of his throwing items out of the window came from Ms. Dunn, whom he argues was not credible. In a related argument, he claims that the jury's guilty verdict for the offense was inconsistent with the jury's not-guilty verdicts for other offenses. The State argues that the evidence is sufficient and that the verdicts are not inconsistent. We agree with the State.

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the

---

[2] According to the Defendant's brief, he arrived in Montgomery County pursuant to the ICD on January 4, 2023. However, statements in an appellate brief are not evidence. *State v. Jones*, No. E2022-01287-CCA-R3-CD, 2023 WL 4797734, at *15 (Tenn. Crim. App. July 27, 2023) (citing *State v. Roberts*, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988)), *perm. app. denied* (Tenn. Jan. 11, 2024).

crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-91 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Therefore, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

Relevant to this case, "[i]t is unlawful for any person, knowing that an investigation or official proceeding is pending or in progress, to . . . [a]lter, destroy, or conceal any record, document or thing with intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding[.]" Tenn. Code Ann. § 39-16-503(a)(1). As our supreme court has stated:

> Thus, the felony offense of tampering with evidence consists of three elements: (1) an ongoing investigation about which the accused knows, (2) the accused alters, destroys, or conceals some "record, document or thing," and (3) the accused tampers with the "record, document or thing" in order to impair its use as evidence in the investigation.

*State v. Majors*, 318 S.W.3d 850, 858 (Tenn. 2010). A criminal attempt occurs when a person acting with the kind of culpability otherwise required for the offense:

> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

- 12 -

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(1)-(3).

Taken in the light most favorable to the State, the evidence shows that the Defendant jumped into the Maxima and fled from Officer Becraft when the Defendant saw the backup officer arrive at the scene. Officer Becraft gave chase but had to stop the pursuit due to its danger to the community. Additional officers later stopped the Defendant, and Ms. Dunn told them that the Defendant had thrown something out of the car near the Excel Market. The officers relayed that information to Officer Becraft, who went to the Excel Market and found several bags containing drugs on the side of the road. Dew was on the grass but not on the bags, indicating that the bags had been left there recently. At trial, Ms. Dunn testified that the Defendant rolled down the passenger window of the car while she was turned around in her seat and that the Defendant later told her that he had thrown something out of the window. Although the Defendant contends that Ms. Dunn was not credible, determining Ms. Dunn's credibility was within the purview of the jury. *See State v. Millsaps*, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that "[t]he weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier[ ] of fact"). The jury obviously accredited her testimony and concluded that the Defendant threw the bags of drugs out of the window, and we may not reconsider the jury's credibility assessment. *See State v. Carruthers*, 35 S.W.3d 516, 558 (Tenn. 2000). Therefore, the evidence is sufficient to support the Defendant's conviction of attempted tampering with evidence.

As to the inconsistent verdict issue, the Defendant contends that he had to possess the drugs in order to attempt to tamper with them but that the jury found he did not possess the drugs, as evidenced by its not-guilty verdicts for possession of methamphetamine and cocaine. However, "possession" is not an element of attempted tampering with evidence. Thus, the jury did not have to find that he possessed the drugs in order to convict him of the offense.

Regardless, the verdicts are not inconsistent. During closing arguments, defense counsel suggested that the drugs belonged to Ms. Dunn and that she threw them out of the window. Soon after the jury acquitted the Defendant of possessing methamphetamine and

cocaine but convicted him of attempted tampering with evidence, he filed a motion for judgment of acquittal, arguing that it was legally impossible for him to throw the drugs out of the window without possessing the drugs. The trial court addressed the motion at sentencing, stating:

> We have then, the possibility that it's an inconsistent verdict. If I recall the proof correctly, there was testimony of them -- of [the Defendant] and, I guess, it was Ms. Dunn, and then [the Defendant] proceeding to throw things out of the window, I believe, over on the passenger side, kind of across, throwing it across Ms. Dunn, and as I was looking at this, you know, aside from the fact that it's possibly an inconsistent verdict, but quite frankly, to me, the jury could determine that, perhaps, he did not have possession of those items that they were evidenced. It may be attributable to the passenger in the car, and he's trying to get -- I mean, the items and the drugs are contraband. They're illegal, and that, in fact, he is attempting to dispose of them[.]

We agree with the reasoning of the trial court. We note that the State charged the Defendant with possessing methamphetamine and cocaine *with intent to manufacture, sell, or deliver*. Based on the proof and arguments by defense counsel, a reasonable jury could have concluded that the drugs belonged to Ms. Dunn and, accordingly, that the Defendant did not possess the drugs with intent to manufacture, sell, or deliver but that he threw the drugs out of the car to dispose of them. In any event, even if we were to conclude that the verdicts were inconsistent, "[i]nconsistent verdicts are permitted as long as there is sufficient evidence for a rational trier of fact to find a defendant guilty beyond a reasonable doubt." *State v. Clark*, No. M2023-01427-CCA-R3-CD, 2025 WL 2985293, at *26 (Tenn. Crim. App. Oct. 23, 2025) (citing *Dunn v. United States*, 284 U.S. 390, 393 (1932), *overruled on other grounds* by *Sealfon v United States*, 332 U.S. 575 (1948)), *perm. app. filed* (Tenn. Dec. 22, 2025). As discussed above, we have determined that the evidence is sufficient to support the conviction of attempted tampering with evidence. Thus, the Defendant is not entitled to relief.

### III. Excessive Sentence

Finally, the Defendant claims that his seven-year sentence for evading arrest, the "almost maximum" punishment in the range, is excessive because it is not the least severe measure necessary under the law, is "unduly harsh," and does not serve the fair principles of sentencing. The State argues that the sentence is not excessive. We agree with the State.

The trial court held a sentencing hearing on July 26, 2024. No witnesses testified at the hearing, but the State introduced the then fifty-three-year-old Defendant's

- 14 -

presentence report into evidence. The report stated that the Defendant graduated from high school and that he obtained a license to operate a forklift. The Defendant described his physical and mental health as "good" but said he took medication for high blood pressure and depression. He said he began consuming alcohol and using marijuana when he was twelve years old and cocaine at seventeen years old. He also stated in the report that he "drank a lot in his younger years" but that he had not consumed alcohol in many years. He said that he last used marijuana in 2007 and last used cocaine in 2010 and that he completed a drug treatment program in July 2011. As to employment, the Defendant said that he had a "spotty" employment record because he had been in and out of prison his entire adult life, that his most recent job was driving a forklift for Tractor Supply in 2019 or 2020, and that he mostly supported himself and his family with poker winnings.

The presentence report showed that the Defendant had the following prior convictions: a misdemeanor conviction for indecent exposure in Montgomery County in 2023, a conviction for robbery committed in Kentucky in 1996, two convictions for possession of cocaine committed in Indiana in July 1989, and two convictions for felony theft committed in Indiana in June 1989. The Defendant received a forty-year sentence for the robbery conviction, and the State submitted proof that he was on parole in Kentucky for the robbery when he committed the offenses in this case. Moreover, the State submitted proof that the Defendant's indecent exposure conviction resulted from his exposing himself to an employee of the Montgomery County Jail while he was awaiting trial in this case. The Defendant's Strong-R assessment classified his overall risk to reoffend as moderate with high needs relevant to employment, moderate needs relevant to family and attitudes/behaviors, and low needs relevant to mental health, residential, education, alcohol/drug use, friends, and aggression. The Defendant gave an allocution in which he asked for mercy so that he could be released from confinement to obtain employment; take care of his mother, who was having health issues; and be with his three young children.

The trial court found that the Defendant was a Range II, multiple offender for the convictions of evading arrest and attempted tampering with evidence, Class D felonies, and was a Range I, standard offender for the conviction of reckless endangerment, a Class E felony. The trial court noted that the ranges of punishment were four to eight years for the Class D felony convictions and one to two years for the Class E felony conviction. *See* Tenn. Code Ann. § 40-35-112(a)(5), (b)(4). The trial court found the following enhancement factors applicable to the convictions: (1), "[t]he defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range"; (10), "[t]he defendant had no hesitation about committing a crime when the risk to human life was high," because the Defendant traveled more than one hundred miles per hour and threw a backpack out of the window, all while operating a motor vehicle with a child in the backseat; and (13), the defendant was released on parole at the time the felony was committed. *See* Tenn. Code Ann. § 40-35-114(1), (10), (13)(B).

The trial court found no mitigating factors applicable. The trial court merged the reckless endangerment conviction into the conviction of evading arrest and sentenced the Defendant to seven years for evading arrest and seven years for attempted tampering with evidence. The trial court did not pronounce a sentence for reckless endangerment. Although the State argued for consecutive sentencing, the trial court ordered that the Defendant serve the seven-year sentences concurrently.

This court reviews the length, range, and manner of service imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). In determining a defendant's sentence, the trial court is to consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the mitigating and enhancement factors, (6) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, (7) any statement by the Defendant in his own behalf about sentencing, and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. *See* Tenn. Code Ann. § 40-35-210(b); *see also Bise*, 380 S.W.3d at 697-98.

In sentencing a defendant, a trial court should impose a sentence that is "no greater than that deserved for the offense committed" and that is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4). Additionally, a trial court is to consider a defendant's potential or lack of potential for rehabilitation or treatment. *Id*. at § 40-35-103(5). The burden is on the defendant to demonstrate the impropriety of his sentence. *See* Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts. This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

*Id*. at § 40-35-210(c).

The trial court should consider enhancement and mitigating factors, but the statutory factors are advisory only. *See id*. at § 40-35-114; *see also Bise*, 380 S.W.3d at 701; *State v. Carter*, 254 S.W.3d 335, 343-44 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id*. at 343 (quoting Tenn. Code Ann. § 40-35-210(d)). Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Id*. at 346.

The record reflects that the Defendant has been committing crimes since he was eighteen years old. By his own account, he has been in and out of confinement his entire adult life. He committed the crimes in this case while he was on parole for a forty-year sentence he received for robbery, and he exposed himself to a jail employee while awaiting trial. The trial court found that three enhancement factors applied in this case, and the Defendant does not contest the applicability of those factors. The trial court sentenced the Defendant within the correct range of punishment, and we conclude that he has failed to show the trial court abused its discretion by ordering a seven-year sentence for evading arrest.

We note that upon merging the conviction of reckless endangerment into the conviction of evading arrest, the trial court entered judgments for both convictions. The judgment for reckless endangerment reflects that it merged into the conviction of evading arrest but does not reflect a sentence because the trial court did not sentence the Defendant for reckless endangerment. "The judgment document for the lesser (or merged) conviction should reflect the jury verdict on the lesser count and the sentence imposed by the trial court." *State v. Berry*, 503 S.W.3d 360, 364 (Tenn. 2015). Therefore, we remand the case to the trial court to impose a sentence on the merged offense and to note the correct Range of Punishment.

- 17 -

## CONCLUSION

Upon review, we affirm the judgments of the trial court but remand the case for the court to impose sentence on count eleven, reckless endangerment.

s/ JOHN W. CAMPBELL
JOHN W. CAMPBELL, SR., JUDGE